**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| BRITTANY ABNEY, | : | Case No. 3:16-cv-417 |
| | : | |
| Plaintiff, | : | |
| | : | |
| | : | District Judge Walter H. Rice |
| vs. | : | Magistrate Judge Sharon L. Ovington |
| | : | |
| NANCY A. BERRYHILL, | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

---

## REPORT AND RECOMMENDATIONS[1]

---

### I.    Introduction

As a child, Plaintiff Brittany Abney received Supplemental Security Income.

When she turned eighteen years old, the Social Security Administration redetermined her

eligibility as required by 20 C.F.R. § 416.987 and found that she was no longer under a

disability. Following a hearing, Administrative Law Judge (ALJ) Elizabeth A. Motta

concluded that Plaintiff's disability ended on March 1, 2013 and she had not become

disabled again since that date. Plaintiff brings this case challenging the Social Security

Administration's denial of her claim for benefits.

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

The case is presently before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. #11), and the administrative record (Doc. #6).

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Motta's non-disability decision.

## II.  <u>Background</u>

Plaintiff asserts that she has been under a disability since at least March 1, 2013, when she stopped receiving benefits as a child. She was eighteen years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. § 416.963(c). She has a limited education. *See* 20 C.F.R. § 416.964(b)(3).

### A.  **Plaintiff's Testimony**

Plaintiff testified at the hearing before ALJ Motta that she struggles with mood swings. (Doc. #6, *PageID* #93). She explained, "I'll be fine one minute … and then the next minute, if someone might say something wrong, I pop off and like want[] to put my hands on people." *Id.* at 94. She has never physically harmed anyone; instead she screams, cusses, and then leaves. *Id.* She used to throw things. *Id.* She does not handle criticism well, and if she is criticized, she cries or "just punch[es] holes." *Id*. at 96. When asked if she wanted to work, Plaintiff responded: "Yes, but right now I'm afraid to work because I'm afraid that I'll lose my tempter. I'll put my hands on people and lose my job. And I can't focus and comprehend." *Id.*

At the time of the hearing, Plaintiff had "just recently" started mental health treatment with Dr. Ramen and a counselor at his office, Deborah. *Id.* at 88-99. She explained that she does not want to attend treatment because she does not want to go anywhere. *Id.* at 88. However, she acknowledged that she "need[s] to be medicated. And since [she's] been on [her] medications, it has really helped a lot." *Id.* at 88-89.

After completing tenth grade, because of Plaintiff's difficulties in school, her high school counselor recommended she enroll in online classes through Electronic Classroom of Tomorrow (ECOT). *Id.* at 86-87. She tried the program but had difficulty focusing, daydreamed a lot, and could not stay awake. *Id.* at 86-87, 95. Ultimately, Plaintiff dropped out of high school her junior year. *Id.* at 86. She attempted GED preparation classes but she could not understand the instructor and "just got up and walked out of the room." *Id.* at 87.

Plaintiff does not live in one place. Instead, she stays with her cousin for a few days, then with her aunt, and then spends a few days with her grandfather. *Id.* at 85-86. During the day, she usually stays inside "behind locked doors because [she] feel[s] safe there." *Id.* at 90. She is afraid to go anywhere because she is afraid that someone will harm her. *Id.* She explained that a few months before the hearing, she was robbed by an individual with a knife. *Id.* at 90-91. Plaintiff watches movies "all day and all night long." *Id.* at 92. She washes dishes but does not do laundry because she does not know how. *Id.* at 91. People have tried to show her, but she "can't comprehend." *Id.* She goes to the grocery store with her aunt or grandfather "once in a blue moon." *Id.* She does not

keep track of her own money—her aunt and cousin help her.  *Id.* at 93.  She obtained a

temporary driving permit but let it expire and is afraid to drive.  *Id.* at 86.

**B.    Medical Opinions**

**i.    Mahmood Rahman, M.D.**

On March 20, 2015, Dr. Rahman, Plaintiff's treating psychiatrist, completed

interrogatories.  *Id.* at 665-72.  He reported that he treated Plaintiff for severe depression,

anxiety, mood swings, considerable agitation, chronic insomnia, impaired concentration,

decreased memory, forgetfulness, distractibility, low frustration tolerance,

procrastination, low productivity, and disorganization.  *Id.* at 666.  He opined that

Plaintiff would not be capable of being be prompt and regular in attendance "because she

has a tendency to procrastinate."  *Id*.  She is "unable to tolerate stress of customary work

pressure [and] [t]ends to become very defensive when criticized."  *Id*.  Plaintiff would be

unable to sustain attention and concentration to meet normal standards of work

productivity and accuracy "due to considerable distractibility" and "uncontrolled racing

thoughts …."  *Id.* at 667.  She would not be capable of getting along with co-workers

without unduly distracting them or exhibiting behavior extremes "[d]ue to her

unpredictable [and] erratic mood swings …," and she would require "considerable

supervision" to sustain an ordinary routine.  *Id.* at 670.  Dr. Rahman concluded that

Plaintiff had marked limitations in her daily living, moderate limitations in her social

functioning, and marked deficiencies of concentration, persistence or pace.  *Id.* at 672.

Dr. Rahman also completed a Mental Impairment Questionnaire on March 22,

2015.  *Id.* at 673-76.  Dr. Rahman diagnosed Plaintiff with bipolar affective disorder and

ADD. He identified the following as Plaintiff's signs and symptoms: poor memory, sleep disturbance, mood disturbances, emotional lability, anhedonia or pervasive loss of interests, psychomotor agitation or retardation, paranoia or inappropriate suspiciousness, difficulty thinking or concentrating, decreased energy, and manic syndrome. *Id.* at 673. Further, Plaintiff was alert, suspicious, guarded, emotionally labile, exhibited paucity of thought, and psychomotor retardation alternating with agitation. *Id.* at 674. He noted she was partially responding to medications with a guarded prognosis. *Id.* Dr. Rahman opined that Plaintiff's impairments or treatments would cause her to be absent from work more than three times a month. *Id.* at 675.

### ii. Giovanni Bonds, Ph.D.

Dr. Bonds evaluated Plaintiff on February 14, 2013.[2] *Id.* at 461-70. Plaintiff reported that she was applying for disability due to feeling anxious, depressed, forgetful, and hyperactivity. *Id.* at 462. She has mood swings, low energy, and difficulty sleeping. *Id.* at 464. She is quick to anger and blows up if someone says something she does not like. *Id.* She also reported several traumatic childhood experiences, including medical issues, frequent shifting of custody, physical abuse, and sexual abuse. Both of her parents died from drug overdoses. *Id.* at 462. At the time of this evaluation, she was not receiving mental health treatment. *Id.* at 463.

---

[2] Dr. Bonds noted that she had previously evaluated Plaintiff for disability on April 1, 2004 and she had reviewed the report. She also referenced another prior psychological evaluation performed by Tyrone Payne, Ph.D., on April 7, 2000. (Doc. #6, *PageID* #463). Neither report is in the record.

Dr. Bonds noted Plaintiff's mood seemed mildly depressed with broad affect and appropriate thought content. *Id.* at 464. She appeared nervous during the interview as indicated by her constantly shaking her foot and biting her fingernails. *Id.* at 465. Dr. Bonds diagnosed Plaintiff with mood disorder, not otherwise specified, and borderline intellectual functioning. *Id.* at 467.

Jonathan A. Hentz, B.A., a psychology assistant, administered the Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV). *Id.* at 461. Dr. Bonds reported Plaintiff's Full Scale IQ score—72—falls in the borderline range. *Id.* at 466. Further, Plaintiff's Verbal Comprehension, Perceptual Reasoning, and Processing Speed fall in the borderline range and her Working Memory falls in the low average range. *Id.*

Dr. Bonds opined that Plaintiff's cognitive abilities are below average and in the borderline range. *Id.* at 468. Although she was able to understand, remember and follow instructions during the testing and interview, she needed help with reading, understanding and completing the history form. *Id.* This "suggests she may have some problems with reading and following written instructions." *Id.* Her attention and concentration were satisfactory. *Id.* However, "[s]he may have some difficulty with working at a competitive speed and performing job tasks consistently." *Id.* Her "ability to relate to supervisors, coworkers or the public may be affected by her problems with controlling her temper. She is easily aggravated by people." As a result, she "may have some difficulties with taking criticism and resolving interpersonal problems that occur at work." *Id.* Dr. Bonds concluded that Plaintiff "would have some difficulties with work

pressures for speed, productivity, dealing with frequent changes in the work and working around many people." *Id.* at 469.

### iii.    Bonnie Katz, Ph.D., & Aracelis Rivera, Psy.D.

Dr. Katz reviewed Plaintiff's records on March 12, 2013. *Id.* at 472-88. She opined that Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. *Id.* at 486-87. Dr. Katz concluded that Plaintiff "is able to [understand and reliably] perform [simple, routine tasks] that are not fast paced, in a setting where contact with others is only superficial. [She] can make simple decisions. [She] is able to adapt to infrequent changes in routine that are easily explained, with new tasks or procedures demonstrated and instructions repeated until [she] can master them, in a setting where supervisory supports are available at times of transition." *Id.* at 488.

On June 20, 2013, Dr. Rivera reviewed Plaintiff's records and affirmed the most of Dr. Katz's assessment. *Id.* at 498-514. She found that Plaintiff was moderately limited in

her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. *Id.* at 499.

## III.   **Standard of Review**

The Social Security Administration provides Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 1382(a). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. § 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc.*

*Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV.     <u>The ALJ's Decision</u>

When the Social Security Administration redetermines a person's eligibility, it uses the rules for adults. 20 C.F.R. § 416.987(b). In the present case, it fell to ALJ Motta to evaluate the evidence connected to Plaintiff's eligibility for benefits. She did so by considering each of the sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. §§ 416.987(b); 416.920(c)-(h). She reached the following main conclusions:

> Plaintiff has the severe impairments of borderline intellectual functioning and mood disorder.
>
> She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "work at all exertional levels, subject to the following limitations: simple, repetitive tasks; low stress work, which in this case is defined as no strict production quotas, no fast-paced work, and only routine work with few changes in the work setting; jobs that would allow for some demonstration in explaining new tasks; no more than simple work-related decision making; no contact with the public as part of job duties; no greater than occasional contact with coworkers, including no teamwork; and reading limited to 7th grade level.."

She does not have past relevant work.

She could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 59-70). These main findings led the ALJ to ultimately conclude that, as of March 1, 2013, Plaintiff was not under a benefits-qualifying disability. *Id.* at 70.

## V.    Discussion

Plaintiff contends that the ALJ failed to give appropriate weight to her treating psychiatrist's opinion. The Commissioner maintains that substantial evidence supports the ALJ's evaluation of Dr. Rahman's opinion.

### A.    Medical Opinions

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians,

commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations

omitted).  The rule is straightforward:

> Treating-source opinions must be given "controlling weight"
> if two conditions are met: (1) the opinion "is well-supported
> by medically acceptable clinical and laboratory diagnostic
> techniques"; and (2) the opinion "is not inconsistent with the
> other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20

C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how

much weight is appropriate, must consider a host of factors, including the length,

frequency, nature, and extent of the treatment relationship; the supportability and

consistency of the physician's conclusions; the specialization of the physician; and any

other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight

placed upon a treating source's opinions.  *Wilson*, 378 F.3d at 544.  This mandatory

"good reasons" requirement is satisfied when the ALJ provides "specific reasons for the

weight placed on a treating source's medical opinions."  *Id*. (quoting Soc. Sec. R. 96-2p,

1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).  The goal is to make clear to

any subsequent reviewer the weight given and the reasons for that weight.  *Id*.

Substantial evidence must support the reasons provided by the ALJ.  *Id*.

ALJ Motta first addressed Dr. Rahman's interrogatories:  "In response to

interrogatories …, Dr. Rahman, the treating psychiatrist, reported that [Plaintiff's]

psychiatric symptoms were of Listing level severity, and, as such, she would be disabled

from all work activity[.]  The ultimate conclusion as to whether an individual satisfies the statutory definition of 'disability' is an issue that is reserved to the Commissioner …." (Doc. #6, *PageID* #66 (citations omitted)).

ALJ Motta's summary of Dr. Rahman's responses is misleading—at best.  His responses neither mention the Listings nor conclude that Plaintiff is "disabled" by any definition of the word.  Instead, Dr. Rahman provides his opinion on Plaintiff's ability to perform various work-related activities and her ability to function in several areas.  Those areas—restriction of activities of daily living; difficulties in maintaining social functioning; and deficiencies of concentration, persistence, or pace—may mirror the Listing criteria, but that is not the same as "a statement by a medical source that you are 'disabled' or 'unable to work' …."  20 C.F.R. § 416.927(d)(1).

Further, even if Dr. Rahman expressed an opinion on the ultimate issue of Plaintiff's disability status, it is not a valid reason to discount or ignore it.  "The pertinent regulation says that 'a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.'  That's not the same thing as saying that such a statement is improper and therefore to be ignored...." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (internal citation omitted); *see Kalmbach v. Comm'r of Soc. Sec.*, No. 09-2076, 409 F. App'x 852, 861 (6th Cir. 2011) ("the fact that the ultimate determination of disability, *per se,* is reserved to the Commissioner, 20 C.F.R. § 404.1527(e) [§ 416.927(d)(1)], did not supply the ALJ with a legitimate basis to disregard the physicians' [opinions].").

But ALJ Motta's analysis of Dr. Rahman's opinion did not stop there. She further concluded that Dr. Rahman's opinion that Plaintiff "is disabled/unemployable cannot be given controlling, or even deferential, weight." (Doc. #6, *PageID#* 66). She instead assigned his assessment "little weight." *Id.* at 67. Although ALJ Motta previously explained the treating physician rule, she does not address it directly while evaluating Dr. Rahman's opinion. However, she does provide several reasons for her finding.

The ALJ acknowledged that Dr. Rahman is a psychiatrist. *Id.* at 66; *see* 20 C.F.R. § 416.917(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."). Specifically, he is Plaintiff's treating psychiatrist. (Doc. #6, *PageID* #66); *see* 20 C.F.R. § 416.917(c)(2) ("Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence ...."). The ALJ observed that he had treated Plaintiff once a month since May 2014.[3] (Doc. #6, *PageID* #66); *see* 20 C.F.R. § 416.917(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). Indeed, at the time Dr. Rahman provided his opinion, he had seen Plaintiff twelve times over the course of just less than

---

[3] The ALJ previously incorrectly states that Dr. Rahman saw Plaintiff "once every two to three months ...." (Doc. #6, *PageID* #62.

one year—ostensibly "long enough to have obtained a longitudinal picture of [Plaintiff's] impairment …." (Doc. #6, *PageID* #s 525-37, 677-80); 20 C.F.R. § 416.917(c)(2)(i).

The ALJ also briefly addressed the consistency of Dr. Rahman's opinion with his treatment notes. She accurately observed that Dr. Rahman's opinion (which indicates Plaintiff's current GAF score is forty-five and her highest in the past year is forty) is inconsistent with his treatment notes that indicate Plaintiff's GAF scores range from fifty to sixty. *Id.* at 66, 673. The ALJ further finds that Dr. Rahman's opinion is not consistent with parts of Plaintiff's consultative exam with Dr. Bonds.[4] She emphasizes that, in contrast to Dr. Rahman's opinion that Plaintiff was distractible, Dr. Bonds noted Plaintiff could maintain attention and concentration during the exam and could recall five random digits forward and five in reverse. *Id.* at 66. But these findings do not conflict with Dr. Rahman's opinion. He opined Plaintiff could not—on a regular, sustained basis, in a routine work setting, in a competitive job placement—sustain attention and concentration on her work to meet normal standards of work productivity and work accuracy.

The ALJ further observed that Plaintiff obtained a Working Memory Index of 80 on the WAIS-IV, placing her in the low average range. *Id*. Notably, the ALJ does acknowledge that Dr. Bonds opined, "[Plaintiff's] working memory is below average"; "Her ability to temporarily retain information in memory, perform some manipulation or operation with it, and produce a result is below average"; and "she may have some

_____

[4] The ALJ assigned Dr. Bonds' opinion "moderate weight." (Doc. #6, *PageID* #65).

difficulty with working at a competitive speed and performing job tasks consistently." *Id.* at 466-68.

ALJ Motta, moreover, addressed supportability of Dr. Rahman's opinion. She acknowledged that Dr. Rahman's opinion is supported by his notes indicating Plaintiff's symptoms included distractibility and lability. *Id.* at 66. The ALJ does not mention that he frequently recorded that Plaintiff's sleep was decreased and she was anxious and guarded. *Id.* at 525-37, 677-80. But, she criticizes his notes as "not very detailed and do not vary much in the way of mental status exams, yet [Plaintiff] testified that medications help." *Id.* at 66. His notes—brief as they may be—support his opinion.

The ALJ, however, criticizes Dr. Rahman's notes further: "Dr. Rahman's chart notes additionally indicate that he prescribed Vyvanse …, which is used to treat ADHD, a condition that was not listed as a diagnosis in his treatment notes, albeit her distraction may be due to another reason[]." *Id.* at 66-67 (internal citation omitted). The ALJ is correct that Dr. Rahman did not diagnose Plaintiff with ADHD (Attention Deficit Hyperactivity Disorder), but he did diagnose ADD (Attention-Deficit Disorder). *Id.* at 536, 673. Further, although Vyvanse (a brand name for lisdexamfetamine) can be "used as part of a treatment program to control symptoms of attention deficit hyperactivity disorder (ADHD; more difficulty focusing, controlling actions, and remaining still or quiet than other people who are the same age) in adults and children[,]" it "may be prescribed for other uses." *Lisdexamfetamine*, MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a607047.html (last updated 8/15/2016). Thus, this does not constitute a good reason for rejecting Dr. Rahman's opinion.

ALJ Motta, when questioning Dr. Rahman's opinion that Plaintiff would constantly require supervision and perpetual redirection, points to school records that indicate "she did well in groups and participated well in discussions but benefited from small group settings with minimal distractions." (Doc. #6, *PageID* #67 (citing Exh. 2F at 43 [Doc. #6, *PageID* #430])). The ALJ left out the next—particularly relevant— sentence: "[Plaintiff] needs verbal prompts and reminders to stay focus[ed] and attentive." *Id.* at 430. Indeed, Plaintiff's short attention span is well documented throughout her school records, beginning in 2001 when she was six years old and repeated kindergarten. *Id.* at 415 ("She had difficulty following multi-step directions. … [She] was described as very active with a short attention span."). In 2010, an intervention specialist, Marjorie Punter, observed, "She needs a great deal of encouragement to complete her work and often does not use her class time wisely …." *Id.* at 426. As a result, Ms. Punter opined, "The teacher will have to watch [her] if she is working on her own to ensure that she is really working." *Id.*

Moreover, the ALJ's reliance on Plaintiff's school records is questionable given that she did not have a copy of Plaintiff's prior file—a file that may have contained favorable psychological evaluations. *Id.* at 59. For example, the psychological evaluation performed in 2008 that is in the record indicates that at that time, Plaintiff reported difficulty with concentration and her grandfather reported she is distractible. *Id.* at 557. Further, at the beginning of her decision, she states "It is clearly the claimant's current functioning that is the issue in this case." *Id.* at 59.

The ALJ also found that Dr. Rahman did not provide any examples in support of his conclusion that Plaintiff "tends to decompensate fairly rapidly when subjected to stress …." *Id.* at 67. She points out that the record does not contain any episodes of decompensation that fit the Listings' criteria and that "she has no mental health treatment history until seeing Dr. Rahman beginning after her request for hearing upon the cessation of her benefits." *Id.* This, however, is not accurate. A treatment summary from the Children's Medical Center of Dayton shows that between March 4, 2008 and August 12, 2008, Plaintiff attended fourteen therapy sessions with Sarah A. Fillingame, Psy.D. *Id.* at 552. Plaintiff's psychological evaluation indicates that Plaintiff was referred to Children's for therapy, and she was evaluated on three separate dates. *Id.* at 555. In addition, generally, "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Blankenship v. Bowen,* 874 F.2d 1116, 1125 (6th Cir. 1989). This is particularly relevant in light of Plaintiff's testimony that she is "afraid to go anywhere, afraid that somebody will harm [her]." (Doc. #6, *PageID* #90).

In addressing supportability, ALJ Motta overlooks or ignores the support provided by Dr. Rahman in his opinions. *See* 20 C.F.R. § 416.927(c)(3) ("The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."). And he provided a significant amount of support. For example, to explain why he opined that Plaintiff could not sustain attention and concentration on her work to meet normal standards of work productivity and work accuracy, Dr. Rahman noted, "Due to considerable distractibility which are psychopathological hallmarks for

both ADD [and] Bipolar disorder. Due to uncontrollable racing thoughts which impair attention/concentration." (Doc. #6, *PageID* #667). And to explain why Plaintiff could not get along with co-workers without unduly distracting them or exhibiting behavioral extremes, he indicated, "Due to her unpredictable [and] erratic mood swings, will have a tendency to distract others." *Id.* at 670.

Throughout the ALJ's evaluation of Dr. Rahman's opinion, she repeatedly "'cherry-picked select portions of the record' rather than doing a proper analysis." *Gentry*, 741 F.3d at 724 (quoting *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013)). For example, she highlights that Plaintiff's Working Memory Index of 80 is in the low average range but leaves out that her Verbal Comprehension Index of 74, Perceptual Reasoning Index of 77, Processing Speed Index of 79, and Full Scale IQ of 72 all fell in the borderline range. (Doc. #6, *PageID* #s 66, 466). The ALJ mentions that Plaintiff testified that her medications help but she says nothing regarding Plaintiff's testimony that she talks to a counselor—Deborah—at Dr. Rahman's office.[5] *Id.* at 66, 89. As explained in more detail above, the ALJ cites only one small part of Plaintiff's school records and ignores evidence that supports Dr. Rahman's opinion. "Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight."

---

[5] Plaintiff's testimony is supported by a fax on July 30, 2014 to Deborah McMullen at Greene Pak Psychiatry and response that noted that Plaintiff "has not seen our therapist more than once." (Doc. #6, *PageID* #526). At that time, Plaintiff had only seen Dr. Rahman three times.

*Brooks v. Comm'r of Soc. Sec.,* 531 Fed Appx. 636, 641 (6th Cir. Aug. 6, 2013) (quoting, in part, *Garner v. Heckler,* 745 F.2d 383, 388 (6th Cir. 1984)).

The reasons provided by the ALJ for rejecting Dr. Rahman's opinion are not supported by substantial evidence and do not amount to "good reasons" for discounting this treating psychiatrist's opinion. The Sixth Circuit "has made clear that '[w]e do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.'" *Cole v. Astrue,* 661 F.3d 931, 939 (6th Cir. 2011) (quoting *Hensley v. Astrue,* 573 F.3d 263, 267 (6th Cir. 2009); *see Bowen,* 478 F.3d at 746 ("[A] decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." (citing *Wilson,* 378 F.3d at 546-47)).

In contrast, ALJ Motta afforded the opinion of the State Agency psychologists "great weight as it is supported by the medical evidence." (Doc. #6, *PageID* #65). Substantial evidence does not support the ALJ's reliance on the opinion of the non-examining, State agency psychologists. There is no indication in the ALJ's decision that she considered or applied the factors when she weighed Dr. Katz's and Rivera's opinions. *Id.* This constitutes error because "[u]nless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other

program physician, psychologist or other medical specialist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us." 20 C.F.R. § 416.927(e)(2)(ii).

Although there can be cases where opinions from State agency medical consultants are entitled to greater weight than the opinions of treating physicians, such is not the case here. Soc. Sec. R. 96-6p, 1996 WL 374180, at *3 (Soc. Sec. Admin. July 2, 1996); *see Blakley*, 581 F.3d at 408-409. Here, the non-examining psychologists based their assessments, in part, on an incomplete record. Their review was conducted in March and June 2013, before Plaintiff received a significant portion of her mental health treatment. The ALJ did not account for this in her decision. As a result, substantial evidence does not support the ALJ's assignment of "great weight" to their assessments.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.

## B.    Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific

reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether her application for Supplemental Security Income should be granted.

## IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's non-disability finding be vacated;

2.	No finding be made as to whether Plaintiff Brittany Abney was under a "disability" within the meaning of the Social Security Act;

3.	This matter be **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

4.	The case be terminated on the Court's docket.


February 8, 2018                              *s/Sharon L. Ovington*
                                              Sharon L. Ovington
                                              United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).